UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CLARENCE ALBERT SAFFOLD, III,

                          Plaintiff,

          v.                                              Case No. 19-cv-1414-pp

MILWAUKEE COUNTY JAIL, *et al.*,

                          Defendants.

**ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO PROCEED WITHOUT PREPAYING FILING FEE (DKT. NO. 2), GRANTING PLAINTIFF'S MOTION TO AMEND COMPLAINT (DKT. NO. 8), SCREENING AMENDED COMPLAINT UNDER 28 U.S.C. §1915A AND DENYING PLAINTIFF'S MOTION FOR APPOINTMENT OF COUNSEL (DKT. NO. 9)**

          Clarence Albert Saffold, III, an inmate at the Racine Correctional

Institution who is representing himself, filed a complaint under 42 U.S.C.

§1983, alleging that the defendants violated his civil rights. This decision

resolves the plaintiff's motions for leave to proceed without prepaying the filing

fee (dkt. no. 2), leave to amend the complaint (dkt. no. 8), and appointment of

counsel (dkt. no. 9) and screens the amended complaint (dkt. no. 14).

I.        **Motion for Leave to Proceed without Prepaying the Filing Fee
          (Dkt. No. 2)**

          The Prison Litigation Reform Act (PLRA) applies to this case because the

plaintiff was a prisoner when he filed his complaint. See 28 U.S.C. §1915(h).

The PLRA allows the court to give a prisoner plaintiff the ability to proceed with

his case without prepaying the civil case filing fee. 28 U.S.C. §1915(a)(2). When

funds exist, the prisoner must pay an initial partial filing fee. 28 U.S.C.

1

§1915(b)(1). He then must pay the balance of the $350 filing fee over time, through deductions from his prisoner account. Id.

On September 30, 2019, the court ordered the plaintiff to pay an initial partial filing fee of $15.27. Dkt. No. 5. On November 6, 2019, the court granted the plaintiff's motion for additional time to pay that fee. Dkt. No. 11. The court received the fee on December 2, 2019. The court will grant the plaintiff's motion for leave to proceed without prepaying the filing fee and will require him to pay the remainder of the filing fee over time in the manner explained at the end of this order.

## II.     Motion to Amend Complaint (Dkt. No. 8)

About two and a half weeks after the court received the complaint, the court received from the plaintiff a motion asking for permission to amend the complaint. Dkt. No. 8. The court received an amended complaint on January 21, 2020. Dkt. No. 14.

The plaintiff stated that he did not believe he properly stated a claim in his original complaint and he asked the court for "an opportunity to include any and all information required before moving forward." Id. The plaintiff did not specify what changes he wished to make, and he did not attach to his motion the proposed amended complaint, as this court's local rules require. See Civil Local Rules 15(a), (b). But the court received the amended complaint from the plaintiff three months later. Dkt. No. 14.

Under Federal Rule of Civil Procedure 15(a)(1), "[a] party may amend its pleading once as a matter of course" within twenty-one days of serving the

complaint or, if the defendants have answered, within twenty-one days after service of the responsive pleading. The plaintiff never served the original complaint (because the court had not screened it), so under Rule 15(a)(1), he has the right to amend it as a matter or course. The court will grant the motion for leave to amend and will screen the amended complaint.

**III.   Screening the Amended Complaint**

A.   Federal Screening Standard

Under the PLRA, the court must screen complaints brought by prisoners seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the prisoner raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Fed. R. Civ. P. 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, accepted as true, to "state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content

that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court construes liberally complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B.     The Plaintiff's Allegations

1.     *The Defendants*

In the caption of the amended complaint, the plaintiff lists the Milwaukee County Jail, G4S Secure Solution and Wellpath Healthcare as defendants. Dkt. No. 14 at 1. In the body of the complaint, however, he lists individual defendants, grouped by affiliation.

From the Milwaukee County Jail he sues Officers Peterson, Nowak and Larcen and Captain Straddler. Dkt. No. 14 at 2. He sues these defendants in their official and individual capacities. Id.

From G4S Secure Solution he sues Officers C. Gilbert and J. Sanchez in their official and individual capacities. Id.

From Wellpath Healthcare he sues Nurses Meradith and Wysocki; Dr. Khan; Registered Nurse Jines; and Jane Does 1, 2 and 3. Id. The plaintiff sues these defendants in only their individual capacities. Id.

        2.    *G4S Transportation of the Plaintiff*

The plaintiff alleges that around 2:00 p.m. on July 11, 2019, while he was a pretrial detainee at the jail, he was escorted to a transportation van to take him to an appointment at the Froedtert Eye Institute. Dkt. No. 14 at 3. The plaintiff was in waist restraints for this process and asked Officer Gilbert to help him secure his seatbelt. Id. at 3–4. The plaintiff says he pointed out to Gilbert that the restraints were "preventing" him because they were unusually high and tight around his waist and he couldn't reach down to secure the belt himself. Id. The plaintiff says he also remarked that "they be driving crazy" from what he'd heard and that he didn't want to get tossed around as a result. Id. at 4. Gilbert responded that he couldn't assist and for the plaintiff "to figure it out." Id. This response bothered the plaintiff, so he told Gilbert that he had a right to safety just like Gilbert and the other officer had; he pointed out that they were wearing seat belts, and asked why he (the plaintiff) had to ride in a metal box unsecured. Id. He says he asked, "If I get injured then what?" Id. The plaintiff says he also told Gilbert that by law, the Department of Transportation "states 'click it or ticket' so are you all above the law or do my safety not matter because I'm an inmate." Id. The plaintiff says that Gilbert responded "Whatever dude! Figure it out yourself" and slammed shut the van doors. Id.

The plaintiff says he couldn't see who drove to the Eye Institute due to the darkened partition. Id. He says, however, that when they arrived at the Eye Institute, he spoke to Gilbert as soon as the van doors opened. Id. The plaintiff says he confronted Gilbert and Sanchez about the speeds he was driven at being "uncomfortable, unsafe, and uncalled for," particularly because the plaintiff was not secure in a seatbelt. Id. at 4. The plaintiff alleges that Sanchez laughed and said, "What[']s the big deal, we're here [and] no one's hurt, relax man." Id. at 4–5. The plaintiff responded that "ya'll had seatbelts on," and that if they had crashed, he would have been injured while they may not have been. Id. at 5.

The plaintiff says he was directed into a wheelchair, given the fact that he was in leg restraints. Id. He says, however, that before he could fully sit into the chair and lift his legs off the ground, Gilbert abruptly started pushing the chair, causing the plaintiff's feet to drag on the ground. Id. The plaintiff says he told Gilbert to hang on a second and let him get situated first, because he was handcuffed. Id. He says that Sanchez responded, "That's who's fault," and chuckled. Id. The plaintiff says he turned to look at Sanchez and saw that Gilbert's face "was frowned up and he was visibly agitated." Id. The plaintiff stood up to get himself into position in the wheelchair, putting his feet into the leg holders, but Gilbert said, "Dude just sit down in the freaking chair and lets get this s**! over with." Id. The plaintiff says he complied because he could see that Gilbert was upset and didn't want to make things worse. Id. He says he looked at Sanchez, but that Sanchez was "attending his cellphone unbothered

6

by his or his partner's remarks and actions." Id. The plaintiff says that once he was properly seated in the chair, Gilbert aggressively pushed it forward. Id. The plaintiff couldn't leave this unaddressed and told Gilbert that Gilbert was being careless in handling the plaintiff; he asked the plaintiff to slow down and be careful before he crashed into something, concluding that "I'm not trying to have to report this so please look out." Id. The plaintiff recounts that Gilbert chuckled and said, "Do what you gotta do." Id. at 6.

Once inside the hospital, a security officer (not a defendant) arrived around 2:45 or 3:00 p.m. to escort the officers and the plaintiff to the elevator. Id. The plaintiff says that they were supposed to get off at the third floor, but that the security officer mistakenly pushed the button for the second floor. Id. He says that when they got on the elevator, he—the plaintiff—was wheeled in first facing the rear of the elevator and the others followed him; he thinks there wasn't anyone else on the elevator at the time. Id. When the door opened on the second floor, everyone started to get off; as the plaintiff was being wheeled off last the security guard indicated that he'd made a mistake and that they were on the wrong floor. Id. The plaintiff says that Gilbert "maneuvered wheelchair aggressively in attempt to get off elevator quickly but was interrupted by security's correction." Id. The plaintiff says that instead of "diligently maneuvering" the chair, Gilbert "proceeded carelessly and swung chair to the left instantly making contact with elevator wall." Id. The plaintiff says that because his feet were propped into the leg holders, his left leg was exposed and made "violent contact with wall as well." Id. The plaintiff says his foot was

7

pinned between the wall and the leg holders of the wheelchair. Id. He says that

he "yelped in pain," and that as Gilbert continued to move the chair the

plaintiff's foot was "bent awkwardly as it was pinned between chair and the

wall." Id. The plaintiff says this went unnoticed for a few seconds, so he had to

try to unpin his foot because Gilbert was still trying to maneuver the chair. Id.

at 6-7.

Gilbert finally noticed that the plaintiff was trying to get his foot

dislodged (or the plaintiff assumes he did) and turned the chair slightly in the

opposite direction, which allowed the plaintiff to move his foot. Id. at 7. By this

time they were off the elevator, but needed to get back on. Id. Just after the

plaintiff got his foot dislodged, Gilbert maneuvered the chair back onto the

elevator, hitting the plaintiff's foot against the wall again when he swung the

chair to the right. Id. Once they were back on the elevator, the plaintiff said,

"F*** man you just f*** up my foot," as well as other obscenities. Id.

Once they got off the elevator on the right floor and checked in at the

nurses' station, a nurse came and escorted them to the room. Id. The plaintiff

says that he was rubbing his foot because of the pain, but that Gilbert stated,

"I don't have my license for these things," and the escorting nurse laughed. Id.

The plaintiff says that as they sat and waited for the doctor to come (between

3:30 and 4:15 p.m.), Gilbert and Sanchez "showed discomfort and impatience

due to long wait time." Id. He says they made comments about being ready to

get off and go home; the plaintiff says he sat silently because he was injured

and he just wanted to get back to the jail and get some medical attention. Id.

He says that Gilbert later asked him, "You good bro?", to which the plaintiff responded that he didn't know, that his foot was hurting badly and he needed medical attention. Id. The plaintiff says that "they" said he probably would have to wait until they got back to the jail because they couldn't just wheel him down to the emergency room. Id. The plaintiff asked why not, but did not get a definitive answer. Id. The plaintiff says he told them to make sure to let the jail know so that "they" could give him some medical attention and not think the plaintiff was making it up; he says "they" agreed they would. Id.

They left the hospital and got back in the van around 4:30 or 4:45 p.m. Id. The plaintiff says that as he was being placed in the van, he again asked Gilbert and Sanchez to help him secure the safety belt. Id. He says that Gilbert responded, "Figure the s**! out dude it isn't rocket science for Christ sakes," and slammed the door. Id. The plaintiff says he heard Sanchez laugh. Id. at 8. The plaintiff says they'd been riding for about five minutes when the van "lurched forward," causing him to fall toward the back of the van. Id. He says he tried to brace himself "against the speeds being driven, that were causing [him] to jerk from left to right, bounce up and down becoming slightly airborne at moments," but he says he "didn't stand a chance." Id. The plaintiff asserts that he yelled numerous times for the officers to slow down, but "got the radio turned up as a result." Id. The plaintiff says the van came to a stop on two occasions and accelerated rapidly, making him hit his head on the rear of the van; he alleges that he was jostled around in the van the whole ride back. Id.

9

The plaintiff says once they arrived back at the jail and the van doors opened, he confronted them, asking which of them was driving; again, he did not get a definitive answer. Id. The plaintiff says that when Gilbert noticed him limping due to his injury, Gilbert "assist[ed]" him out of the van by grabbing his arm "aggressively." Id. The plaintiff alleges that he limped into the jail because of the pain and that he stopped to brace himself because he became dizzy. Id. He says he heard one of the officers say, "dude it[']s not all that serious." Id. The plaintiff says that once he got steadied, he asked for clarification, telling them that he'd asked them to be careful and to help him secure the seatbelt, that they'd done neither and that now he was injured but they claimed it wasn't that serious. Id. The plaintiff claims that Sanchez shrugged his shoulders. Id. He says that he reminded them to tell the jail staff about what had happened so that he could get proper medical attention, but that Gilbert sarcastically responded, "Yeah, OK" and Sanchez chuckled. Id.

The plaintiff says that after he got back in the jail, G4S escorted him to the housing unit. Id. He says that as he waited to speak to Unit Officers Peterson and Gil about his injuries, Gilbert threw the plaintiff's identification card onto the desk and he and Sanchez "scurried off." Id. The plaintiff says that he called after them, but they just kept going "with no intentions on informing the jail of [the plaintiff's] substained injuries." Id. The plaintiff says they left about 5:00 p.m. Id.

The plaintiff asserts that Gilbert and Sanchez violated his Eighth and Fourteenth Amendment rights, that they were negligent and that they were

deliberately indifferent to his safety from harm and injury. Id. at 9. He alleges in passing that "G4S's company policy is said to have cause in part decision or whole [sic]." Id. He alleges that he has left foot/ankle strain that impedes him from walking or standing for long periods without pain and discomfort; head and neck injuries that prevent him from performing routine actions without pain; back pain; psychological damage from the concussion he sustained; and the need to use a cane to talk and stand for the rest of his life. Id.

### 3. *Medical Treatment*

The plaintiff says that around 5:00 p.m., he told Officer Peterson about what had happened and about his injuries, and asked Peterson to call the medical staff so the plaintiff could get medical attention; he says Peterson agreed to do so. Id. at 11. The plaintiff ways he waited forty minutes before again asking Peterson whether he had called medical staff. Id. Peterson repeated that he would do so but told the plaintiff "to give him a minute." Id. The plaintiff responded that he was in severe pain and was afraid he'd pass out from his head injury. Id. Peterson said he was going to call and that the plaintiff should wait a minute, then remarked that the plaintiff did not look injured. Id. The plaintiff told Peterson that it wasn't Peterson's job to decide medical things and that the plaintiff just needed him to contact medical staff; Peterson laughed and said "ok." Id. The plaintiff says he laid down awhile, then about 6:30 went out by the dayroom officer's desk but no medical staff had arrived. Id. The plaintiff says he asked Peterson whether he'd called a nurse, but that Peterson looked at him and said, "Dude why you sweating me." Id. The

plaintiff told Peterson that Peterson was playing games, that he'd asked Peterson several times to contact medical because he was hurt but that Peterson had disregarded him. Id. The plaintiff asked Peterson to call a lieutenant; he says Peterson picked up the phone and spoke to someone for a few minutes, then hung up and said a nurse was coming. Id. The plaintiff asked Peterson why it took so long for Peterson to call, but that Peterson didn't give him an answer. Id.

The plaintiff says that Nurse Meradith came to the housing unit at 7:00 p.m. and spoke with him. Id. The plaintiff told her exactly what he'd told Peterson. Id. at 11-12. Meradith examined his foot, told the plaintiff that his foot did not look broken and wrapped it with an ace bandage. Id. at 12. The plaintiff asked if he could get something for his headache and neck pain as well as his foot/ankle pain; Nurse Meradith told him "yeah" but said she would have to check with her supervisor first. Id. The plaintiff says that when he described his head injury to Meradith, she did nothing but look at him and smile. Id. She told him he'd be seen the next day and left; the plaintiff received nothing for his pain. Id.

The next day—July 12—the plaintiff told Officer Young (not a defendant) that he'd been told he be seen that day by medical, and he asked Young to call and see whether that was still the case. Id. Young made a call, then told the plaintiff that he wouldn't be seen that day. Id. The plaintiff submitted a medical request form communicating his pain and discomfort and asking for services. Id. He got no medical services on July 12. Id. The plaintiff alleges that going

into the morning hours of July 13, 2019, he "could not rest" because his neck had become stiff and he was experiencing chest pains and dizziness. Id. He says he told officers to call a medical emergency, and that a Jane Doe supervisor arrived, gave the plaintiff 400 mg of ibuprofen, and told him that he'd be seen later that day and that she didn't know anything else. Id. The plaintiff says that around 2:45 that afternoon, Nurse Jane Doe #1 came by and did a concussion check. Id. at 13. He says she told him she would come and do these checks for the next few days to make sure he didn't have a concussion, but that that was the only day that she came. Id. The plaintiff says he reported dizziness, lightheadedness, headaches, confusion, blackouts to nurses who came to the housing unit and on medical health service forms. Id.

Just before midnight on July 13, 2019, the plaintiff asked Officer Nowak to contact the medical staff because he was in severe pain, his neck was very stiff, and he was "starting to lose mobility." Id. He says that Nowak's exact words were, "They're not going to do anything because it[']s not cardiac, diabetic, or seizure related." Id. The plaintiff says he asked Nowak to call a medical emergency but Nowak did not; he says Nowak left the housing unit and the plaintiff did not get medical assistance that night. Id.

The next day, July 14, Dr. Khan saw the plaintiff. Id. The plaintiff says he described his injuries, how he'd gotten them and the symptoms that had followed. Id. The plaintiff says that he asked for crutches or some means of support for walking because walking was difficult due to the foot/ankle injury. Id. The plaintiff says that Khan told him that this wasn't necessary, that Kahn

13

believe he had a strain in his foot. Id. The plaintiff explained that it was extremely painful to walk and almost impossible to walk without support, but Khan still denied him. Id. at 13-14. The plaintiff also talked to Khan about his head injury and neck pain, but Kahn told him that he needn't worry about a concussion "because the incident happened days ago." Id. at 14. The plaintiff asked if Khan was aware that a nurse had told him she would monitor for concussion over the next few days, and Khan said "yeah not to worry." Id. The plaintiff told Khan that he still was getting dizzy and having headaches and that his neck was stiff; he also told Khan the pain was moving into his back. Id. Khan told the plaintiff he would order medication and physical therapy. Id. The plaintiff asked if he could get a CT scan, MRI or x-ray to see what was going on, asking if that wasn't routine when someone suffers "from these kind of injuries." Id. Khan stated that it wasn't that serious and took a phone call, after which the plaintiff was told to keep his foot elevated, drink water and rest. Id. Khan told the plaintiff he'd be seen again in a few days. Id. The plaintiff again asked for crutches, and Khan again denied the request. Id.

The plaintiff says that on July 15, he asked Officer Larcen to grab a wheelchair for him because it was painful to walk to the HSU. Id. The plaintiff says that Larcen refused. Id. The plaintiff showed Larcen the ace wrap on his foot and explained the situation, but Larcen still refused. Id.

The plaintiff says that he was given ibuprofen for seven days and that he informed medical that this didn't help with his pain. Id. The plaintiff says that after seven days, he didn't receive anything. Id. The plaintiff says that Dr. Khan

14

ordered medication for him but that he didn't get them until he asked a nurse

in a medical request form why he wasn't getting anything. Id. at 14–15. He says

he went four or five days without the medication that was prescribed to him.

Id. at 15. The plaintiff alleges that Nurse Marshall (not a defendant) said that

he didn't know why "they" weren't giving the plaintiff the medications and that

he would "put it through for the plaintiff to "continue additional days to make

up for the days they were not given" to the plaintiff. Id. He says that after seven

days, he was discontinued from pain medication. Id.

The plaintiff asserts that he submitted "many requests" between July 11

and August 6 "in attempt to communicate all medical issues to medical staff."

Id. He says that after submitting grievances, someone came to speak to him. Id.

He says that on approximately August 6, Nurse Wysocki came to speak with

him, telling him that Captain Straddler had told her to come after seeing the

grievances. Id. The plaintiff alleges that although he submitted many

grievances, no one came to see him until he mentioned proceeding civilly. Id.

The plaintiff says that Wysocki asked him what was going on and he explained

that he wasn't receiving treatment, that he was being told that he was receiving

treatments and monitoring that he hadn't received. Id. He explained that he'd

been asking for tests and scans to rule out his injuries being more serious than

he was being told. Id. Wysocki told the plaintiff that she didn't have any

records from doctors about anything other than his foot injury. Id. The plaintiff

says he told her about his head injury and all his medical requests, and that

Wysocki said she would look into x-rays although she did not believe he needed

testing. Id. The plaintiff alleges that another nurse, whose name he does not know, was present during this conversation. Id. The plaintiff also says that Wysocki said she didn't have any complaints filed on or around the injury date; the plaintiff says he told her to look because he'd submitted many. Id. He said Wysocki told him he'd be seen shortly and left. Id.

The plaintiff says that on August 7 at about 1:45 p.m., Nurse Jines called the plaintiff to the Health Services Unit. Id. She told the plaintiff that she was told only to assess the plaintiff's foot injury, that no one had told her or left any records about a head injury. Id. The plaintiff told Jines that he'd been submitting medical forms about it and had told Wysocki about it yesterday. Id. at 16. The plaintiff told Jines about all his issue—his neck stiffness progressing into back pain and the worsening of his foot/ankle injury because he had no support while walking. Id. Jines said she thought the back pain was muscular and that she would order physical therapy. Id. The plaintiff responded that Khan had said he would order physical therapy almost a month ago and that the plaintiff never had gotten any. Id. Jines said she didn't know what was going on, that nothing had been ordered "by him", and she wondered why he had not gotten an x-ray of his foot and why there were no documented records. Id. Jines said she had ordered an x-ray that day. Id. The plaintiff told her that the pain in his back didn't feel muscular and that he wanted testing. Id. He says that Jines told him she would order Tylenol and ibuprofen, but she never said anything about testing for his back. Id. The plaintiff asked Jines for crutches or something to assist him because it was still painful to walk. Id. The

16

plaintiff says that Jines told him that the jail wouldn't allow her to issue any for safety purposes. Id. The plaintiff says he pointed out that there were people in the jail who had crutches, but that Jines just shrugged her shoulders and said that it was the policy, sorry. Id.

The plaintiff says he got an x-ray of his foot on August 13, a month after the injury. Id. He says that during the x-ray, Nurse Jane Doe #2 performed the procedure without providing him radiation protection, although he asked her. Id. He says that after she took the first picture, he asked her whether she was supposed to give him something to cover his genitals (as nurses had in the past). Id. She said she was sorry and gave him a lead protector; the plaintiff asserts that she had on a lead vest herself the whole time. Id.

The plaintiff says that he received physical therapy on August 15 and 26, 2019. Id. He alleges that at the first appointment, therapist Jane Doe #3 told him she had a referral only to perform therapy on his back. Id. The plaintiff says that he told her about his foot issue, and she told him that she could tape it but that was it. Id. The plaintiff says that at the second session the therapist was "indifferent to her duties." Id. She didn't have him lay down, she was agitated when he came in the room, she had him sit in a chair when she put electrostimulation pads on his back so he didn't get full, proper treatment. Id. The plaintiff says he submitted a grievance about her performance on August 30 but that he never received a response. Id.

On September 3, 2019, the plaintiff was transferred to Dodge Correctional Institution. Dkt. No. 14 at 16. He alleges that Straddler "was made

17

aware of officials' activities by way of grievances," but made no attempts outside of sending Wysocki to speak with him after the plaintiff threatened to proceed civilly. Id. at 17. The plaintiff says that Straddler did not follow up to ensure that he was getting proper medical treatment, and that despite all his grievances Straddler was indifferent and made no attempts to remedy things. Id. The plaintiff asserts that all the jail staff were deliberately indifferent and that they could see he needed medical attention but they did nothing to make sure he got it, that they made their own medical judgments about whether he needed attention. Id. The plaintiff also alleges that jail staff were negligent. Id.

The plaintiff says that medical staff did not provide testing or treatment that "any medical community would deem due process to" his injuries. Id. at 18. He says that he described his injuries and pain, asked for tests and treatment and complained of pain and discomfort but received deliberate indifference and suffered further injuries. Id.

4. *Relief*

The plaintiff asserts claims under the Eighth, Fourteenth and Fourth Amendments. Dkt. No. 14 at 20. He seeks punitive, compensatory and nominal damages. Id.

C.    Analysis

1. *Official Capacity Claims*

The plaintiff has sued several Milwaukee County Jail officials in their official capacities. These claims are construed as if brought against the jail itself. But the jail is not a "person" subject to suit under §1983. Federal Rule of

18

Civil Procedure 17(b) provides that defendants in a federal lawsuit must have the legal capacity to be sued. State law determines an entity's capacity to be sued. Webb v. Franklin Cty. Jail, No. 16-cv-1284, 2017 WL 914736 at *2 (S.D. Ill. Mar. 8. 2017). Under Wisconsin law, the Milwaukee County Jail "is not a legal entity separable from the county government which it serves," and is therefore not subject to suit under §1983. Whiting v. Marathon Cty. Sherriff's Dept., 382 F.3d 700, 704 (7th Cir. 2004). The court will dismiss the jail as a defendant.

The court could liberally construe the plaintiff's official-capacity claims as claims against Milwaukee County, but to the extent the plaintiff seeks to sue Milwaukee County, he has not stated a claim. A local government such as a municipality or county "cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." Monell v. Dep't. of Soc. Serv., 436 U.S. 658, 691 (1978) (emphasis in original). A municipality may be liable under §1983 "only for its own violations of federal law." Los Angeles Cty., Cal. v. Humphries, 562 U.S. 29, 36 (2010) (citing Monell, 436 U.S. at 694). To demonstrate municipal liability, a plaintiff "must demonstrate that there was an 'official policy, widespread custom, or action by an official with policy-making authority [that] was the "moving force" behind his constitutional injury.'" Estate of Perry v. Wenzel, 872 F.3d 439, 461 (7th Cir. 2017) (quoting Daniel v. Cook Cty., 833 F.3d 728, 734 (7th Cir. 2016)). "[T]he touchstone of 'official policy' is designed 'to distinguish acts of the *municipality* from acts of

19

*employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.'" City of St. Louis v. Praprotnik, 485 U.S. 112, 138 (1988) (quoting Pembaur v. Cincinnati, 475 U.S. 469, 479–80 (1986) (emphasis in original)).

The plaintiff has not alleged that Milwaukee County has a policy or custom of misdiagnosing, mistreating or ignoring the medical complaints of inmates. He instead attributes his injuries and mistreatment to the individual officers, nurses and doctors at the jail. At one point he alleges that a nurse told him that a jail policy prohibited her from providing him with crutches. But the plaintiff does not allege that this was a policy of Milwaukee County or that the County had endorsed it. Nor has he challenged the policy itself (if such a policy exists). He has provided no basis for the court to attribute to Milwaukee County the actions of its employees, so he has not stated a claim against Milwaukee County.

The plaintiff has sued G4S Officers Gilbert and Sanchez in their official capacities, so the court construes those as claims against G4S itself. While the complaint does not describe G4S, but it appears to be a private company. See https://www.bloomberg.com/profile/company/0662320D:IN. A private corporation that has contracted to provide essential government services, such as transportation for prisoners, "cannot be held liable under § 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself." Shields v. Ill. Dep't of Corr., 746 F.3d 782, 789 (7th Cir. 2014). The private corporation may not be held liable for the actions of its

20

employees under a theory of *respondeat superior*. Id. (citing Iskander v. Vill. of Forest Park, 690 F.2d 126, 128 (7th Cir. 1982)); see Monell, 436 U.S. at 694. A plaintiff seeking to hold a private corporation liable for constitutional violations must show "that his injury was caused by a [G4S] policy, custom, or practice of deliberate indifference . . . or a series of bad acts that together raise the inference of such a policy." Id. at 796 (citing Woodward v. Corr. Med. Servs. of Ill., Inc., 368 F.3d 917, 927 (7th Cir. 2004)).

The plaintiff's only allegation about a G4S custom or policy is that a "company policy is said to have cause[d]" his injuries in whole or in part. Dkt. No. 14 at 9. He does not specify what that company policy was; for example, he did not allege that G4S has a policy endorsing reckless driving or encouraging its employees to carelessly transport inmates in vans or wheelchairs. This vague assertion of a G4S policy is not sufficient to state a claim against G4S.

The plaintiff does not appear to have sued any employees of Wellpath Healthcare in an official capacity. He has not described Wellpath Healthcare's involvement in the events he described in his complaint and has not made any allegations against the company.

> 2.  *Individual Capacity Claims*
>
>> a.   G4S Officers Gilbert and Sanchez

Because the plaintiff was a pretrial detainee at the time of the alleged events, the court analyzes his claims against Officers Gilbert and Sanchez under the Fourteenth Amendment. See Hardeman v. Curran, 933 F.3d 816, 821–22 (7th Cir. 2019) (citing Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473

(2015)). To show a violation of the Fourteenth Amendment, the plaintiff must show that Gilbert and Sanchez acted "with purposeful, knowing, or reckless disregard of the consequences" of their actions. Miranda v. Cty. of Lake, 900 F.3d 335, 354 (7th Cir. 2018). It is not enough to show they acted with negligence or even gross negligence. See Williams v. Ortiz, 937 F.3d 936, 942 (7th Cir. 2019) (citing McCann v. Ogle Cty., 909 F.3d 881, 886 (7th Cir. 2018)). The plaintiff also must show that the conditions of his confinement were objectively unreasonable; that is, he must show that the conditions were not "'rationally related to a legitimate non-punitive governmental purpose'" or that they were "'excessive in relation to that purpose.'" Hardeman, 933 F.3d at 822 (citing Kingsley, 135 S. Ct. at 2473). The court must "focus on the totality of facts and circumstances" that the defendants faced and "gauge objectively— without regard to any subjective belief held by the individual—whether the response was reasonable." Williams, 937 F.3d at 942.

The plaintiff has not stated a claim against Gilbert for causing his foot/ankle injury. He alleges that Gilbert negligently maneuvered him while he was seated in a wheelchair and inadvertently wedged the plaintiff's foot between the wheelchair and a wall, causing his injury. This is negligence, not intentional action. Neither negligence nor gross negligence is a basis for liability under §1983. See Farmer v. Brennan, 511 U.S. 825, 835 (1994); Williams, 937 F.3d at 942. Although Gilbert should have exercised more care when pushing the plaintiff in the wheelchair, and should have been more empathetic about

22

the plaintiff's pain, he cannot be held liable under §1983 for negligently causing the plaintiff's foot injury.

The plaintiff also alleges that Gilbert and Sanchez were aware that he couldn't fasten his seatbelt and secure himself inside the transport van, but that one or both of them drove the transport van recklessly, causing him significant head, neck and back injuries. Although the plaintiff does not know which officer drove the van, the plaintiff alleges that both were aware of his vulnerability in the van and both purposefully ignored his concerns of his safety. His allegations in this regard state a claim of deliberate indifference under the Fourteenth Amendment.

Section 1983 allows a plaintiff to sue individuals who acted "under color of state law." Rodriguez v. Plymouth Ambulance Serv., 577 F.3d 816, 822 (7th Cir. 2009). A private party may act under color of state law only when the party "acted together with or . . . obtained significant aid from state officials" and did so to such a degree that its actions may properly be characterized as "state action." Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982).

The complaint does not allege a basis for concluding that G4S Officers Gilbert and Sanchez acted under color of state law when they transported the plaintiff. It is possible, even likely, that G4S contracted with the jail to transport inmates to and from the jail for things like medical visits. The plaintiff "can[not] be charged fairly with knowing" whether G4S provided its services under a contract between G4S and the jail, which could make the officers state actors in this lawsuit. See Rodriguez, 577 F.3d at 830. The court

23

will assume, for screening purposes only, that Officers Gilbert and Sullivan were acting under color of state law when they transported the plaintiff to and from the jail and will allow the claim against them to proceed. The plaintiff will need to use discovery to find out whether they were state actors at the time of the incident and whether they are proper defendants in this suit.

b.    Milwaukee County Jail Officials

The plaintiff alleges that multiple officers, nurses and doctors were deliberately indifferent to his serious medical needs at the jail after he suffered his injuries. These claims also arise under the Fourteenth Amendment. See Miranda, 900 F.3d at 352. To show deliberate indifference in violation of the Fourteenth Amendment, a plaintiff must show that the medical care provided was objectively unreasonable and that the defendants purposefully, knowingly or recklessly disregarded the consequences of their actions. Id. at 352–54 (citing Kingsley, 135 S. Ct. 2466).

The plaintiff alleges that Officer Peterson did not call medical staff to come evaluate the plaintiff for over ninety minutes. In the context of a convicted prisoner's Eighth Amendment claim for deliberate indifference to serious medical issues, "[a] delay in treatment may show deliberate indifference if it exacerbated the inmate's injury or unnecessarily prolonged his pain." Turner v. Reena, No. 17 C 2434, 2019 WL 2357031, at *4 (N.D. Ill. June 4, 2019) (quoting Perez, 792 F.3d at 777-78). A pretrial detainee is "entitled to at least [as] much protection" under the Fourteenth Amendment as are convicted prisoners under the Eighth Amendment. Miranda, 900 F.3d at 350. Although

24

the plaintiff does not allege that his condition worsened while he waited ninety minutes for a nurse to evaluate him, he does allege that he was in severe pain at the time and believed he might pass out. The plaintiff also alleges that he asked Peterson three times to call medical staff, and that it was only when he asked Peterson to call a lieutenant that Peterson finally called a nurse. He alleges that Peterson's delay was purposeful and unreasonable. The court will permit the plaintiff to proceed on a Fourteenth Amendment claim against Peterson.

The plaintiff alleges that Nurse Meradith first treated him by wrapping his injured foot with an ace bandage. He says that Nurse Meradith did not provide him pain medication and told him she would have to check with her supervisor before she could give him the medication. She also told the plaintiff that he would receive treatment the next day, but that treatment never came. The plaintiff has not stated a claim against Nurse Meradith. The plaintiff doesn't think simply wrapping his foot with an ace bandage was proper treatment. But "medical professionals receive significant deference when their judgments encounter challenges under the Eighth Amendment."[1] Knight v. Grossman, 942 F.3d 336, 341 (7th Cir. 2019) (citing Wilson v. Wexford Health Sources, Inc., 932 F.3d 513, 519 (7th Cir. 2019)). "[D]isagreement with the course of treatment does not support a claim for deliberate indifference." Hyatt

---

[1] "Although the Eighth Amendment does not apply to pretrial detainees, pretrial detainees are entitled to *at least* as much protection as the constitution provides convicted prisoners." Board v. Farnham, 394 F.3d 469, 477-78 (7th Cir. 2005) (citing Cavalieri v. Shepard, 321 F.3d 616, 620 (7th Cir. 2003)).

v. Marchant, 777 F. App'x 819, 821 (7th Cir. 2019) (citing Proctor v. Sood, 863 F.2d 563, 568 (7th Cir. 2017)). Nor was it unreasonable for Nurse Meradith not to provide pain medication to the plaintiff because, as she explained to him, she had to check with her supervisor for approval to dispense medication. See, e.g., Holloway v. Delaware Cty. Sheriff, 700 F.3d 1063, 1075 (7th Cir. 2012) (concluding that nurses who lacked authority to prescribe medication on their own were not liable for not dispensing medication to prisoner plaintiff). Nor has the plaintiff shown that Nurse Meradith was personally responsible for the fact that he was not seen the next day. The court will dismiss Nurse Meradith as a defendant.

The plaintiff alleges that an unknown supervisor evaluated him for a medical emergency, gave him ibuprofen and told him that medical staff would further evaluate him later that day, which he was. The plaintiff does not allege that the supervisor unreasonably treated his emergency at the time, and the plaintiff received treatment later that day just as she said he would.

The plaintiff alleges that Nurse Jane Doe #1 performed a single concussion test but never returned to further test for a concussion or monitor the plaintiff's symptoms. He has not alleged that the nurse refused to further test or monitor the plaintiff or that she purposefully or recklessly discontinued concussion tests. Nor does he allege that the nurse's treatment was unreasonable. The plaintiff has not stated a claim against Nurse Jane Doe #1.

The plaintiff alleges that Officer Nowak did not contact medical staff when the plaintiff told Nowak he was in severe pain and beginning to lose

mobility in his neck. He says that Nowak left the housing unit and that the plaintiff received no medical treatment until the next afternoon. Although plaintiff says that Nowak told the plaintiff that medical staff would not do anything because the plaintiff's medical issue was not severe enough, it was arguably unreasonable for him—a correctional officer—to assume that he knew what medical professionals would do if he had informed them of the plaintiff's complaints. While there may be questions about whether the information the plaintiff gave Nowak was sufficient to make Nowak aware that the plaintiff's medical needs were "objectively serious," the court will assume as much for the purposes of screening, and the way the plaintiff has described Nowak's actions supports a conclusion that Nowak demonstrated a "'deliberately indifferent' state of mind." Bremel v. Haines, Nos. 17-cv-347, 17-cv-348, 2020 WL 373265, at *5 (W.D. Wis. Jan. 23, 2020) (quoting Gutierrez v. Peters, 111 F.3d 1364, 1369 (7th Cir. 1997)). The court will permit the plaintiff to proceed on a Fourteenth Amendment claim against Nowak.

The plaintiff alleges that Dr. Khan did not order any tests or imaging for the plaintiff's head injury but that he did prescribe pain medication. He also alleges that Khan told the plaintiff he would order physical therapy but failed to do so. The plaintiff says that Khan told him not to worry about a possible concussion because it "happened days ago," even though the plaintiff reported continuing symptoms. He says that Khan also refused to provide the plaintiff a walking aid because he believed the plaintiff had only strained his foot and told him to rest, drink water and elevate his foot.

27

Khan's treatment of the plaintiff's head injury was not objectively unreasonable. The plaintiff does not allege that he was eventually diagnosed with a concussion or that Khan's medical judgment for treating the plaintiff's symptoms was unsound. Nor does he allege that testing or imaging would have better addressed his pain or his concerns. He alleges only that he requested tests but was denied. Neither medical malpractice nor disagreement with a doctor's medical judgment will support a claim of deliberate indifference. See Berry v. Peterman, 604 F.3d 435, 441 (7th Cir. 2010) (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)). Although it is possible Khan could have differently treated the plaintiff's complaints about his head injury, the fact that he did not provide perfect treatment, or the treatment the plaintiff wanted, is not enough to state a Fourteenth Amendment violation.

The plaintiff's allegations regarding Khan's reaction to his foot injury may could also be construed as a disagreement about treatment—the plaintiff thought he needed a cane or other walking aid and Khan did not agree. But the plaintiff alleges that Khan would not give him a walking aid (and would not explain why) even though the plaintiff told him more than once that it hurt to walk. While the plaintiff alleges that Khan prescribed him pain medication, that does not address the plaintiff's claim that it hurt for him to walk on the ankle and that Khan gave him no device to assist him in walking. While it is a close call, the court will allow the plaintiff to proceed on a deliberate indifference claim against Khan.

The plaintiff alleges that on one occasion, Officer Larcen denied his request for a wheelchair when he was taken to the Health Services Unit. The plaintiff does not allege he could not walk; he says was painful to do so, even when his foot was wrapped. Like Nowak, the plaintiff alleges that Larcen knew that the plaintiff was in pain but did nothing to help him. The court will allow the plaintiff to proceed on his claim against Larcen.

The plaintiff next alleges that Nurse Wysocki spoke with him about his medical issues and informed him she had not seen any records reflecting his head injury. She told the plaintiff she would "look into x-rays," which the plaintiff eventually received. Wysocki did not ignore the plaintiff and the plaintiff does not allege that her treatment of him was deficient. Nor does he allege that she purposefully or recklessly interfered with his treatment from other medical staff. The plaintiff has not stated a claim against Wysocki.

The plaintiff alleges that Nurse Jines ordered an x-ray of his foot and physical therapy for his back. She also prescribed him pain medication but told him that prison policy prohibited her from prescribing him crutches. This is hardly deliberate indifference. The plaintiff's allegations show that Jines addressed the plaintiff's concerns more than perhaps any other medical professional. The plaintiff faults Jines for not providing him crutches, but his own allegations belie a claim of deliberate indifference because he says her reason for denying him the crutches was the prison policy prevented her from doing so. The court will dismiss Jines as a defendant.

The plaintiff alleges that Nurse Jane Doe #2 performed the x-ray of his foot but failed to provide him lead protection for his genitals when she took the first picture of his foot. He has not alleged that the nurse purposefully or recklessly failed to give him lead protection; as the plaintiff recites the facts, it sounds like an oversight. Malpractice or negligence does not amount to a constitutional violation. See Berry, 604 F.3d at 441; Estelle, 429 U.S. at 106. Nor has the plaintiff alleged that he suffered any ill effects from the single x-ray taken before he was wearing the lead protector. The PLRA bars prisoner suits "for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. §1997e(e). Because the plaintiff does not allege that he suffered any injury from the unprotected x-ray, he may not proceed on this claim against Nurse Jane Doe #2.

The plaintiff alleges that Jane Doe #3, a physical therapist, gave him incomplete treatment of his back during one of his two sessions. He alleges that she provided electrostimulation but did not have him lie down for manual therapy "like [the] first session." Jane Doe #3 did not ignore the plaintiff's medical needs. The court already has explained that disagreement with a course of treatment is not sufficient to state a constitutional claim. The court will dismiss Jane Doe #3 as a defendant.

The plaintiff also alleges that unspecified officials at the jail failed to send his full medical records to Dodge Correctional Institution after he was transferred. This vague allegation does not name any defendant who was responsible for sending the incomplete records. His allegations stated generally

30

against the staff at the jail are insufficient state a claim against any defendant. See Gray v. Weber, 244 F. App'x 753, 754 (8th Cir. 2007) (affirming dismissal of inmate's §1983 complaint alleging denial of medical care against defendants identified "only collectively as 'medical staff'").

Finally, the plaintiff alleges that Captain Straddler knew that the other officials' conduct was substandard but made no attempt to correct their behavior or ensure the plaintiff received appropriate treatment. Under §1983, "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*" Iqbal, 556 U.S. at 676. Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Id. Non-medical officials are entitled to "rely on the expertise of medical personnel" and "will generally be justified in believing that the prisoner is in capable hands." Arnett v. Webster, 658 F.3d 742, 755 (7th Cir. 2011) (citing Greeno v. Daley, 414 F.3d 645, 656 (7th Cir. 2005)). It is only when a non-medical official entirely ignores an inmate's complaints or has sufficient notice of "an excessive risk to inmate health or safety" that he may be found deliberately indifferent. Id. (quoting Vance v. Peters, 97 F.3d 987, 993 (7th Cir. 1996)).

Straddler was not a medical professional, did not treat the plaintiff himself and did not order a specific course of treatment. Moreover, the plaintiff alleges that it was Straddler who had Wysocki meet with the plaintiff to evaluate him and discuss his medical issues. The plaintiff suspects that Straddler responded to his many complaints only after the plaintiff threatened

to sue. That may be, but it does not change the fact that Straddler *did* respond to the complaints by sending Wysocki.

## IV.    Motion to Appoint Counsel

In a civil case, the court has the discretion to recruit counsel for individuals unable to afford counsel. Navejar v. Iyola, 718 F.3d 692, 696 (7th Cir. 2013); 28 U.S.C. §1915(e)(1); Ray v. Wexford Health Sources, Inc., 706 F.3d 864, 866–67 (7th Cir. 2013). "[D]eciding whether to recruit counsel 'is a difficult decision: Almost everyone would benefit from having a lawyer, but there are too many indigent litigants and too few lawyers willing and able to volunteer for these cases.'" Henderson v. Ghosh, 755 F.3d 559, 564 (7th Cir. 2014) (quoting Olson v. Morgan, 750 F.3d 708, 711 (7th Cir. 2014)).

In exercising its discretion, the court must consider two things: "(1) 'has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so,' and (2) 'given the difficulty of the case, does the plaintiff appear competent to litigate it himself?'" Pennewell v. Parish et al., 923 F.3d 486, 490 (7th Cir. 2019) (quoting Pruitt v. Mote, 503 F.3d 647, 653 (7th Cir. 2007)). To satisfy the first prong, the court must determine that a plaintiff made a good faith effort to hire counsel. Pickett v. Chi. Transit Authority, 930 F.3d 869, 871 (7th Cir. 2019). To do so, the plaintiff must show he contacted at least three lawyers and provide the court with (1) the lawyers' names; (2) their addresses; (3) how and when the plaintiff attempted to contact the lawyer; and (4) the lawyers' responses.

In particular, the lawyers' responses may have bearing on the court's decision to exercise its discretion because they may shed light on whether the plaintiff's attempts to hire counsel were reasonable. <u>Pickett</u>, 930 F.3d at 871. In deciding whether to recruit counsel, the court should consider the reasons the lawyer declined representation, including whether the plaintiff was unwilling (as opposed to unable) to pay a retainer; whether the lawyer lacked time or capacity to take on new clients; or whether the subject matter of the case requires a lawyer who specializes in a specific area of law. <u>Id.</u> The court should also consider how well the plaintiff articulated his case to the prospective lawyer. <u>Id.</u> Where a plaintiff "conveyed his situation well and counsel deemed the claim feeble, then it would be inappropriate for a court to intervene" and recruit counsel. <u>Id.</u> But, where a plaintiff is inarticulate, then a court "may have a useful role to play in recruiting counsel." <u>Id.</u>

When considering the second element, the court "must examine the difficulty of litigating specific claims and the plaintiff's individual competence to litigate those claims without counsel." <u>Pennewell</u>, 923 F.3d at 490. The court looks at "whether the difficulty of the case, factually, legally, and practically, exceeds the litigant's capacity as a layperson to coherently litigate the case." <u>Id.</u> This includes "all tasks that normally attend litigation," such as "evidence gathering, preparing and responding to court filings and motions, navigating discovery, and putting on a trial." <u>Id.</u> at 490–91. The court "must consider the plaintiff's literacy, communication skills, education level, litigation experience, intellectual capacity, psychological history, physical limitations and any other

33

characteristics that may limit the plaintiff's ability to litigate the case." <u>Id.</u> at 491. In situations where the plaintiff files his motion in the early stages of the case, the court may determine that it is "impossible to tell whether [the plaintiff] could represent himself adequately." <u>Pickett</u>, 930 F.3d at 871.

In the plaintiff's motion to appoint counsel, dkt. no. 9, he says that he can't afford a lawyer. He says that being in prison will make it difficult for him to litigate and that the case probably will need substantial investigation and discovery. <u>Id.</u> He says that the issues are complex, and that he has never been a party to a civil proceeding. <u>Id.</u> He says a trial will likely involve conflicting testimony and a lawyer would be best able to assist in presenting evidence and conducting cross-examination. <u>Id.</u> He says that he has made repeated efforts to obtain a lawyer but that everyone he has contacted has denied his requests. <u>Id.</u>

The court will deny the plaintiff's motion to appoint counsel at this early stage in the case. He states that he has "made repeated efforts to obtain a lawyer." Dkt. No. 9. But he has not provided the court with names of the lawyers he contacted or letters showing that they declined to represent him. Even if the plaintiff had provided the court with proof of his attempts to retain counsel, the extensive, meticulous, highly-detailed and articulate amended complaint shows that the plaintiff understands the issues involved in his case, knows the details relevant to presenting and proving his claims and comprehends his role at this point in the litigation. The next step will be for the defendants to respond to the complaint, so there is nothing a lawyer could do for the plaintiff at this stage. If, as the case progresses, the legal and factual

issues become too complex for the plaintiff, his circumstances may change, or he may find himself unable to obtain the information he believes he needs to prove his claims, he may renew his motion. But at this stage, the court is fully convinced that the plaintiff is quite capable of representing himself.

## V.     Conclusion

The court **GRANTS** the plaintiff's motion for leave to proceed without prepaying the filing fee. Dkt. No. 2.

The court **GRANTS** the plaintiff's motion to amend his complaint. Dkt. No. 8.

The court **ORDERS** that the amended complaint at Dkt. No. 14 is the operative complaint.

The court **DENIES** without prejudice the plaintiff's motion for appointment of counsel. Dkt. No. 9.

The court **ORDERS** that defendants Milwaukee County Jail, G4S Secure Solution, Wellpath Healthcare, Nurse Meradith, Nurse Wysocki, Registered Nurse Jines, Captain Straddler, Jane Doe #1, Jane Doe #2 and Jane Doe #3 are **DISMISSED**.

Under an informal service agreement between Milwaukee County and this court, a copy of the amended complaint and this order have been electronically transmitted to Milwaukee County for service on Officer Peterson, Officer Nowak and Officer Larcen. Under the informal service agreement, the court **ORDERS** those defendants to file a responsive pleading to the amended complaint within 60 days.

35

The court **ORDERS** the U.S. Marshals Service to serve a copy of the amended complaint and this order on Officer C. Gilbert, Officer J. Sanchez and Dr. Khan under Federal Rule of Civil Procedure 4. Congress requires the U.S. Marshals Service to charge for making or attempting such service. 28 U.S.C. §1921(a). Although Congress requires the court to order service by the U.S. Marshals Service, it has not made any provision for either the court or the U.S. Marshals Service to waive these fees. The current fee for waiver-of-service packages is $8.00 per item mailed. The full fee schedule is provided at 28 C.F.R. §§0.114(a)(2), (a)(3). The U.S. Marshals Service will give the plaintiff information on how to remit payment. The court is not involved in collection of the fee.

The court **ORDERS** defendants Gilbert, Sanchez and Khan to file a responsive pleading to the amended complaint.

The court **ORDERS** that the agency that has custody of the plaintiff shall collect from his institution trust account the **$334.73** balance of the filing fee by collecting monthly payments from the plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to the plaintiff's trust account and forwarding payments to the clerk of court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. §1915(b)(2). The agency shall clearly identify the payments by the case name and number. If the plaintiff transfers to another county, state or federal institution, the transferring institution shall forward a copy of this order, along with the plaintiff's remaining balance, to the receiving institution.

36

The court will send a copy of this order to the officer in charge of the agency where the plaintiff is confined.

The court **ORDERS** that the parties may not begin discovery until after the court enters a scheduling order setting deadlines for discovery and dispositive motions.

The court **ORDERS** that plaintiffs who are inmates at Prisoner E-Filing Program institutions must submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the court. Plaintiffs who are inmates at all other prison facilities must submit the original document for each filing to the court to the following address:

> Office of the Clerk
> United States District Court
> Eastern District of Wisconsin
> 362 United States Courthouse
> 517 E. Wisconsin Avenue
> Milwaukee, Wisconsin 53202

DO NOT MAIL ANYTHING DIRECTLY TO THE JUDGE'S CHAMBERS. It will only delay the processing of the matter.

The court advises the plaintiff that if he fails to file documents or take other required actions by the deadlines the court sets, the court may dismiss the case based on his failure to diligently pursue it. The parties must notify the clerk of court of any change of address. Failure to do so could result in orders

or other information not being timely delivered, which could affect the legal
rights of the parties.

Dated in Milwaukee, Wisconsin, this 30th day of September, 2020.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**